## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DAVID T. JACKSON,

      Plaintiff,                                Case No. 18-14009
                                                 Hon. Denise Page Hood

v.

THE CITY OF DETROIT, et al.,

      Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [#48] and DENYING PLAINTIFF'S MOTION TO FILE ADDITIONAL BRIEF [#57]

## I.    INTRODUCTION

Plaintiff David Jackson filed this action in the Third Judicial Circuit, Wayne County, on October 26, 2018. Defendants removed it to this Court on December 21, 2018. Plaintiff alleges that Defendants: (1) violated his rights pursuant to 42 U.S.C. § 1983 and 1985 (Count I); (2) maliciously prosecuted him (Count II); (3) falsely arrested and imprisoned him (Count III); and (4) were grossly negligent (Count IV). On October 31, 2019, Defendants filed a Motion for Summary Judgment. ECF No. 48. Plaintiff filed a timely response, and Defendants were granted leave to file a late reply. The Court previously notified the parties that the Motion would be decided on the briefs. ECF No. 62. For the reasons that follow, the Court **grants** the Motion

insofar as it pertains to Count Four, **denies** the Motion with respect to Count I and III, and **grants in part and denies in part** the Motion with respect to Count II.

## II.   BACKGROUND

On October 19, 2017, a 13 year old resident ("KR") was home alone on the 20200 block of Stahelin Street, in the City of Detroit, when she heard noises coming from the side of her house. *See* ECF No. 56, Ex. 2 (DPD Request for Warrant) at 7. KR was laying down in her mother's bedroom because she was sick and stayed home from school that day. ECF No. 56, Ex. 3 (Trial Transcript) at 6-7.  Upon hearing the noises, KR called her mother by telephone, *id*. at 7, and told her mom that someone was at the window. ECF No. 56, Ex. 4 (Prelim. Exam. Transcript) at 7.  KR called 911 after screaming at the sight of the intruder. *Id*.

Defendants Detroit Police Department ("DPD") officers Julian Sage and Wendell Smith were first to respond to the home invasion, ECF No. 56, Ex. 2 at 3 (PgID 580), after receiving call for a "PERP DESCRIPTION REGARDING A B/M WEARING A BLK NY YANKEE HAT BLK HOODIE [WHO] WAS ATTEMPTING TO COME T[H]ROUGH BATHROOM WINDOW." ECF No. 56, Ex. 2 at 8 (PgID 585).  According to the Investigator's Report prepared by Defendant DPD officer Fabio Buscemi, KR advised that she "peeked through the shade to see if anyone was there, she observed a black male with medium complex[]ion, black and

2

white Yankees Baseball cap, yellowish teeth, with a goatee and an earring." *Id*. at 2 (PgID 579). On the audio of the videotape from the body camera worn by Defendant DPD officer James Pierce, however, Sage and Smith broadcast a description over the radio when requesting assistance to detain Plaintiff. Ex. 2, p.7.  That audio identified the suspect as a black male with a "dark" complexion wearing a New York Yankees baseball cap.

At approximately 9:30 a.m., Plaintiff was walking approximately 4 to 5 homes south of KR's home on Stahelin. ECF No. 56, Ex. 1 (Body Cam DVD Video Footage) at 0:0-0:29.  Defendants Pierce and DPD officer Evan Humes approached Plaintiff in response to the request for assistance from Sage and Smith and within minutes, several other Detroit police officers arrived on the scene. Pierce was wearing a body camera and the video begins at the point Pierce and Humes approach Plaintiff with their initial interaction as he is walking down the street with a book in his hand. Plaintiff was first given a verbal command to "come over here" (meaning to the police car), and he complied, including placing his hands (spread out) on the police vehicle. Humes immediately frisked and handcuffed Plaintiff and removed the hood of the fleece to determine if Plaintiff was wearing a baseball cap.  Pierce asked Plaintiff, "you don't have a baseball cap, do you?" As Humes removed the hood, Plaintiff responded "no."  Pierce began to explain to Plaintiff why he was detained, stating that

3

Plaintiff was stopped because there was a complaint of someone trying to break into a home on that street and Plaintiff's clothing matched some of the clothing of the suspect.  Pierce stated, "it probably isn't you."

After several minutes, an officer asked over the radio, "does he have a NY Yankees hat?" Pierce responded, "negative."  Pierce began to describe Plaintiff over the radio to the officers at the house with the resident, saying that Plaintiff was someone in his early 30s, height 5'7" to 5'10", approximately 220 pounds.  Pierce commented to another officer "it's not him," and he complained that the witness did not indicate any facial features.  Pierce told the officers with KR that Plaintiff did not have on a New York Yankees baseball cap, his teeth were normal (rather than yellowish as KR had indicated to them), and he did not have an earring in the left ear as described by the resident.  Pierce says, "nope it's not him."

Pierce gave instructions to Humes to get Plaintiff's name for the report in preparation to release him. The officer(s) with KR radioed for the police officers to take a picture of Plaintiff and send it to them, which was then shown to KR (in essence, a photographic show up).[1] At that point, an unnamed officer who just told

---

[1]A show-up is an identification procedure in which the police present a single suspect to an eyewitness and then ask the eyewitness whether the suspect is the perpetrator. Michael D. Cicchini, Joseph G. Easton, *Reforming the Law on Show-Up Identifications*, 100 J.Crim. L. & Criminology 381 (2010). Show-ups can also take the form of photo show-up, where a single photo, rather than a photo

Pierce that "it's not him [Plaintiff]," took a picture of Plaintiff from the front and side profiles and that officer sent the photograph of Plaintiff to the requesting officer(s) (Smith and/or Sage).   Another officer began to ask Plaintiff more questions to determine why he was on that street (Stahelin).

One officer consistently tried to convince Pierce to run Plaintiff through the Law Enforcement Information Network ("LEIN").  Pierce repeatedly responded that he was not going run Plaintiff through the LEIN system, stating at one point that "we stopped somebody for walking down the street," stating "that's the problem with what's going on today," and "I don't think it's fair."  The other officer asserted that Plaintiff could be a "murderer," and after a discussion about whether the investigation should transition from the crime to an investigation about Plaintiff, the other officer finally convinced Pierce to change the investigation about the suspected crime to an investigation about Plaintiff.  Pierce eventually allowed Plaintiff to be run through LEIN.  As a result, they learned that Plaintiff had outstanding warrants, and Plaintiff was arrested.

About that time, the officers received a report over the radio that a suspect matching KR's description of the perpetrator was seen running through the adjacent wooded area. Sage, Smith, and other officers left the scene of the crime to search the

---

array, is presented to a witness. *Id.* at fn. 33.

wooded area for that suspect, but they never located that suspect.

Pierce's narrative report concluded with this sentence: "the offender [Plaintiff] was not the home invasion suspect of 202[--] Stahelin." ECF No. 56. Ex 5. That narrative report, including Pierce's conclusion that Plaintiff was not the suspect, was tracked with another case number. That narrative report and Pierce's conclusion were never provided to Plaintiff's counsel in the criminal proceeding against Plaintiff. That report was only discovered among other reports in the prosecutor's file during this litigation. The report indicates that it was printed by Buscemi after Plaintiff's preliminary examination but months before Plaintiff's criminal trial. *Id.*

The investigation of the home invasion was assigned to Buscemi, who was given one suspect – Plaintiff. ECF No. 56, Ex. 6 (Deposition of Buscemi) at 52. Buscemi advised the officers at the scene to order evidence technicians to process the window for suspect prints. ECF No. 56, Ex. 2 at 7. KR testified that she was present at home when "the people dusted the window for prints." ECF No. 56, Ex. 3 at 19 (on the other hand, Buscemi asserted that no prints were ever taken). At that time, there was no indication that the suspect wore gloves, and KR testified about gloves for the first time at trial. ECF No. 56, Ex. 3 at 9, 14-16. Sage testified that he documented in his report that he ordered the evidence technician and spoke to "Cassini at DTU." Ex. 3, p.34; see also Ex. 2, p.7. Pierce testified that: (a) he found no gloves, and (b)

6

Plaintiff did not have any cuts or bleeding consistent with someone breaking glass with their hands. ECF No. 56, Ex.3 at 40.

Buscemi had only a few months' experience as an officer in charge at the time of the incident and had no special training for investigations of Breaking & Entering Crimes. ECF No. 56, Ex. 6 at 10.  He testified that no one ever processed the window for prints and no physical evidence connected Plaintiff to the crime. ECF No. 56, Ex. 6 at 10, 29-30, 52.  Buscemi relied solely on the witness statement of KR (a 13-year old) and her selection of Plaintiff in a photo array to establish probable cause for arresting Plaintiff on home invasion charges. *Id*. at 21-22. Buscemi also did not have any training in administering a photo array lineup and had only limited experience with using photo arrays. *Id.* at 12.  His supervision during the photo array was non-existent, and his oversight of the investigation was "minimal." *Id*. at 20.

Buscemi sent officers of the DPD Home Invasion Task Force to arrest Plaintiff on the basis of having probable cause, although there was no more evidence to support the arrest than was available on October 19, 2017, when Pierce concluded that Plaintiff was not the home invasion suspect. ECF No. 56, Ex. 5.  The arresting officers, Defendants Justin Lyons, Bradley Clark and Paul Glaza, did not conduct any independent investigation, as they relied on the representation of probable cause that Buscemi provided to effectuate the arrest.  Plaintiff was imprisoned for 218 days, from

October 30, 2017 to June 5, 2018, before a jury acquitted him of the home invasion charge after less than 20 minutes of deliberation.  Each individual Defendant testified against Plaintiff at the criminal jury trial.

In retrospect, Buscemi questions the validity of the arrest of Plaintiff and states that he was not aware of the exculpatory information. *Id.* at 53.  In the course of the investigation, no one attempted to confirm Plaintiff's representation that he was walking to work for Metro Plumbing at the time and date of the incident. *Id*. at 56-57.

In his response, Plaintiff stipulates to the dismissal of Glaza and Humes, neither of whom was ever served with the Summons and Complaint, and the dismissal of his gross negligence claim. *See* ECF No. 56, PgID 537 (at n.1 (gross negligence claim) and n.2 (Humes)); PgID 538 (at n.3 (Glaza)).

## III.   APPLICABLE LAW

## A.   Legal Standard

Rule 56(a) of the Rules of Civil Procedures provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is

"genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 322-23. A court must look to the substantive law to identify which facts are material. *Anderson*, 477 U.S. at 248.

## B.  Qualified Immunity

Defendants argue that the officers are entitled to qualified immunity. As recently stated by the Supreme Court:

> The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. A clearly established right is one that is sufficiently clear that every

reasonable official would have understood that what he is doing violates that right. We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.

*Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citations and quotation marks omitted).

Qualified immunity is a two-step process. *Saucier v. Katz*, 533 U.S. 194 (2001). First, the Court determines whether, based upon the applicable law, the facts viewed in a light most favorable to the plaintiff show that a constitutional violation has occurred. Second, the Court considers whether the violation involved a clearly established constitutional right of which a reasonable person in the defendant's position would have known. *Saucier v. Katz, supra*.; *Sample v. Bailey*, 409 F.3d 689 (6th Cir. 2005). Only if the undisputed facts or the evidence, viewed in a light most favorable to the plaintiff, fail to establish a prima facie violation of clear constitutional law can this Court find that Defendants are entitled to qualified immunity. *Turner v. Scott*, 119 F.3d 425, 428 (6th Cir. 1997).

Once a government official has raised the defense of qualified immunity, the plaintiff "bears the ultimate burden of proof to show that the individual officers are not entitled to qualified immunity." *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 494 (6th Cir. 2012) (citation omitted). A plaintiff also must establish that each individual defendant was "personally involved" in the specific constitutional violation.

*See Salehphour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir. 1998); *Bennett v. Schroeder*, 99 F. App'x 707, 712-13 (6th Cir. 2004) (unpublished) ("It is well-settled that to state a cognizable Section 1983 claim, the plaintiff must allege some personal involvement by the each of the named defendants").

## IV.   ANALYSIS

### A.   October 19, 2017 Stop of Plaintiff

Plaintiff contends that Pierce, Sage, and Smith violated his Fourth Amendment right against unreasonable seizures when they unlawfully detained him on October 19, 2017. Defendants maintain that the officers are entitled to qualified immunity because there was no constitutional violation or violation of clearly established law when officers performed a *Terry* stop and arrested Plaintiff on outstanding arrest warrants. Pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), any restraint on a person amounts to seizure in violation of the Fourth Amendment unless justified by probable cause or, in the event of an investigatory stop, a showing of reasonable suspicion. *See, e.g., United States v. Cortez*, 449 U.S. 411, 417-18 (1981). In order for an investigatory stop to be valid, there must be some objective manifestation that the person stopped is or is about to be engaged in criminal activity. *Brown v. Texas*, 443 U.S. 47, 51 (1979).

Plaintiff argues that Pierce stopped Plaintiff pursuant to Sage's and Smith's

radio description of "a black male walking down the street from a home invasion."

ECF No. 56, at 38.  Plaintiff asserts that he was stopped, frisked, and handcuffed for

walking down the street.  Plaintiff notes that Pierce realized within two minutes of the

encounter that Plaintiff was not wearing a black and white New York baseball cap and

stated "it probably wasn't you [Plaintiff]."  Plaintiff argues that, within four minutes

of the stop, two of the three characteristics (no baseball cap, normal teeth) would rule

out Plaintiff as the perpetrator, as Pierce recognized after four and half minutes,

stating "this is not him, this is not going to be him."  Approximately five minutes into

the stop, Pierce stated that Plaintiff did not have an earring or pierced ear, as KR had

indicated the perpetrator did.  Plaintiff contends that, "[a]t that point the stop should

have concluded, because they no longer had reasonable suspicion that [Plaintiff] was,

or was about to be[,] engaged in criminal activity." ECF No. 56, PgID 568 (citing

*Brown*, 443 U.S. at 51).

Defendants argue that all they did was perform a *Terry* stop of Plaintiff and,

while gathering information from the eyewitness to determine what to do next, learned

that Plaintiff had outstanding felony and misdemeanor and felony warrants that

resulted in arresting Plaintiff.  Defendants rely on *United States v. McMullin*, 739 F.3d

943 (6th Cir. 2014).  In *McMullin*, the police received a call for an ongoing breaking

and entering. The officers arrived within 10 minutes and saw a man standing in front

12

of the house. He began to walk away from the house as the police approached. The police asked him to stop and show his hands, and he was frisked for weapons. That search revealed an illegal revolver in the suspect's waistband. The eyewitnesses to the breaking and entering claim they attempted to tell the officers prior to the frisk that the suspect was their friend and not the perpetrator, but the officer said he had no contact with those witnesses prior to the search. The suspect was not charged with the breaking and entering but was charged with being a felon in possession of a firearm. *Id*. at 944-45.

The *McMullin* court found that "the specific circumstances presented to the officers upon their arrival to the scene of the reported breaking-and-entering provided the reasonable suspicion necessary to justify both stopping and frisking [the suspect]." *Id*. at 945. The court's reasonable suspicion determination was based on the suspect's presence near the scene of the crime within minutes after the crime and that he began to walk away from the home as the police approached. *Id*. at 947. The court said the facts that pointed away from the suspect's guilt—his statement to the police that he was "here for [his] people" and the witness's yelling that he was "not the guy"—were not enough to negate the officer's reasonable suspicion. *Id*. The Sixth Circuit joined at least five other circuits in holding that suspicion of burglary alone is sufficient to justify a frisk of the suspect. *Id*. at 946.

13

Plaintiff does not, however, challenge the *Terry* stop. Plaintiff asserts that, by the end of six minutes, Sage and Smith heard from Pierce that there was no earring and that Pierce was satisfied that Plaintiff should be released from detainment. Plaintiff argues that: (1) any further delay in releasing him was unreasonable; and (2) when the Defendant officers subsequently took a picture of him and reached in Plaintiff's pocket to take out Plaintiff's identification, they did so without lawful authority, probable cause, or lawful consent.

Defendants argue that, while they were holding Plaintiff for investigative purposes, they had a right to check his identification and run a warrant check, even though it was unrelated to the crime for which he was stopped. *United States v. Young*, 707 F.3d 598, 601, 605-06 (6th Cir. 2012). Defendants assert that, under a totality of the circumstances, the officers had reasonable suspicion to stop and frisk Plaintiff and check his identification because he partially matched the description of the suspect and was walking down the street where the incident occurred. For that reason, Defendants assert that there was no underlying constitutional violation or violation of clearly established law, such that they were entitled to qualified immunity for their actions on October 19, 2017.

The Court finds that Defendants did not have reason to believe they had consent, probable cause, or lawful authority to take out Plaintiff's identification in this

14

matter.  By the time Defendants took Plaintiff's identification card from him, they had completed their investigatory stop.  Pierce had only given instructions to Humes to get Plaintiff's name for the report in preparation to release him, as he (Pierce) had already concluded that Plaintiff was not the suspect.  The Court finds it significant that, other than being a black male, Plaintiff did not match any of the critical features of the suspect that had been reported.  He did not have the New York Yankees baseball cap or dark pants and, more significantly, did not have yellowish teeth, an earring or even a pierced ear.  As Defendants lacked probable cause to continue to detain Plaintiff, they had no basis for running a LEIN check on him before releasing him.  This case is unlike *McMullin*, where the firearm that was discovered during a frisk at the time that defendant was stopped, not after the police determined that he was not a suspect with respect to the underlying crime.

**B.     Photographic Show-up and Buscemi's Investigation**

Defendants contend that the key issue with respect to Buscemi's investigation was KR's identification of Plaintiff through the use of an array of six photographs. Defendants acknowledge that "[t]he Due Process Clause prohibits the use of identification that, under the totality of the circumstances, are impermissibly suggestive and present an unacceptable risk of irreparable misidentification." *Carter v. Bell*, 218 F.3d 581, 605 (6th Cir. 2000).  With respect to a pre-trial identification,

15

there is a two-step analysis: (1) was the process unduly suggestive; and (2) if so, was the identification nevertheless reliable under the totality of the circumstances. *Ledbetter v. Edwards*, 35 F.3d 1062, 1070-71 (6th Cir. 1994). If the process was not unduly suggestive, the court need not consider the second step; however, if the process was unduly suggestive, the court must consider five factors:

> (1) opportunity of the witness to view the criminal at the time of the crime,
>
> (2) the witness's degree of attention at the time of observation,
>
> (3) the accuracy of the witness's prior description of the criminal,
>
> (4) the level of certainty demonstrated by the witness when confronting the defendant; and
>
> (5) the length of time between the crime and the confrontation.

*Id.* at 1071.

Defendants assert that this case is like two Sixth Circuit cases where the analysis ended after the court concluded that the photo lineups were not unduly suggestive: *United States v. Peterson*, 411 F. App'x 857 (6th Cir. 2011) (differences in clothing and age were not unduly suggestive "[i]n light of the many substantial similarities between those in the photo array"); *United States v. Washington*, 714 F.3d 962 (6th Cir. 2013).

Defendants argue that Buscemi compiled a photo array of men that all

reasonably resembled Plaintiff, as they were all had similar complexions, similar hairstyles, five of six had facial hair, and grayscale was used.  Buscemi also allegedly told KR that the perpetrator may or may not be in the photo array.  Defendants argue that the fact Plaintiff was the only person wearing a black hoodie is not unduly suggestive "in light of the many substantial similarities between those in the photo array."  Defendants state that Plaintiff saw the perpetrator up close, was not inconsistent in her description afterwards, identified Plaintiff without hesitation, and made her identification only a week after the incident.

Plaintiff argues that the photo array was unduly suggestive even before it was assembled.  Plaintiff states that Defendants took his picture when they stopped him on October 19, 2017, and then sent it to Sage and Smith, who were at the scene of the crime with KR. Plaintiff argues – and Defendants do not respond – that such actions violated Plaintiff's constitutional rights. Plaintiff contends that the subsequent photo array was irreparably tainted because: (1) only the photo of Plaintiff was shown to KR shortly after the break-in at her house; and (2) the assigned report number on the photo array matched the officers' narrative report number from the initial encounter.

Plaintiff asserts that the officers also violated DPD policy against a single photo show-up.  Plaintiff states that DPD directive number 203.11-2 requires officers to adhere to certain eyewitness identification procedures to maximize the reliability of

identifications, minimize unjust accusations, and conform to established legal procedures, including never showing a witness only a photograph of the suspect. ECF No. 56, Ex. 12. Plaintiff argues that his rights were violated when Sage or Smith asked Pierce to send over a photograph and that request was complied with immediately, without question by any officer on the scene. Plaintiff states that, once that single photo was shown to KR, it was no surprise that she later picked Plaintiff in the photo array presented by Buscemi.

Plaintiff also asserts that Buscemi's method of presenting the photo array to Plaintiff was deficient because Buscemi created the photo array and presented it to KR. As discussed below, that is inconsistent with the sequential, double-blind process recommended for large cities and by the Michigan State Police, the Michigan Prosecuting Attorneys Association, and many other law enforcement agencies.

The Court concludes that Defendants are not entitled to qualified immunity with respect to the taking of the single photo and showing it to KR at the scene, which also violates DPD policy. *See* ECF No. 56, Ex. 12. The Court finds that a reasonable officer would know that, under the totality of the circumstances, the use of the single photo identification at the scene of the crime would be "impermissibly suggestive and present an unacceptable risk of irreparable misidentification," *Carter*, 218 F.3d at 605, and that using such identification methods were not reliable. A reasonable factfinder

could determine that such actions were in violation of the Due Process Clause.

### C.      Arrest of Plaintiff on October 30, 2017

Defendants assert that Plaintiff's arrest on October 30, 2017 was reasonable because, under an objective standard, there was probable cause for his arrest. Citing *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988).  Defendants rely on Plaintiff's presence near the scene of the crime moments after it occurred, claim he closely matched the victim's description of the burglar, and note that KR identified Plaintiff in a photo array within a week of the date of the crime.  Defendants argue that the evidence did not have to be "completely convincing or even . . . admissible at trial." *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008).

Defendants assert that Plaintiff's arraignment and probable cause hearing – pursuant to which the state court determined that there was probable cause – foreclosed the liability of those who detained Plaintiff. *Wallace v. Kato*, 549 U.S. 384, 389 (2007).  Defendants acknowledge that, if the state court's determination was based on materially false statements, a subsequent civil challenge to probable cause is not precluded. *Darrah v. City of Oak Park*, 255 F.3d 301, 311 (6th Cir. 2001); *Hinchman v. Moore*, 312 F.3d 198, 202 (6th Cir. 2003).  Defendants argue that, in this case, however, the only witness at the preliminary examination was KR (the victim), and she made an in-court identification of Plaintiff as the person who broke into her home.

Plaintiff asserts that Defendants are liable under federal and state law for false arrest and false imprisonment because they unreasonably seized and arrested him without probable cause.  He argues that Defendants possessed nothing but the false and tainted identification of Plaintiff by KR, as discussed above.  Specifically, those reasons include that: (a) Plaintiff did not match the descriptions of KR on October 17, 2019; (b) the photo of Plaintiff taken after Pierce determined that, as a result of the *Terry* stop, Plaintiff was not the suspect, which mean that it was wrongfully taken and wrongfully shown to KR on October 17, 2019; (c) the unconstitutional photo array; and (4) the fact that no new inculpatory evidence was developed after the initial encounter between Defendants and Plaintiff.

The Court agrees with Plaintiff.  Defendants did not have probable cause to take any action beyond a *Terry* stop.  Accordingly, there was no basis for Plaintiff's arrest and subsequent imprisonment, there is a genuine dispute of material fact with respect to – and Defendants are not entitled to qualified immunity as to – Plaintiff's claims for false arrest and false imprisonment.

## D.    Malicious Prosecution

Plaintiff asserts that Pierce, Sage, Smith, and Buscemi are liable for malicious prosecution because there was no probable cause for the pursuit and prosecution of home invasion charges.  A malicious prosecution claim premised on the Fourth

Amendment requires that a plaintiff must show: (1) a criminal prosecution was initiated against the plaintiff; (2) that defendant made, influenced, or participated in the decision to prosecute; (3) as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty, apart from the initial seizure, including confinement imposed pursuant to the legal process; and, (4) the criminal proceeding must have been resolved in the plaintiff's favor. *Sykes v Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010). There is no dispute that elements (1), (3), and (4) have been satisfied.

Plaintiff has established a genuine issue of material fact with respect to Sage, Smith, and Buscemi, each of whom prepared a report pursuant to which Plaintiff was charged and prosecuted. Defendant Wendall Smith testified that it was his "job here today [at trial] to try to put [Plaintiff] in prison." Pierce, on the other hand, prepared a narrative report that concluded that Plaintiff was not the suspect of the home invasion at Stahelin. As there is no evidence that Pierce participated in the advancement of the case against Plaintiff, the Court dismisses the malicious prosecution claim against Pierce that is rooted in the Fourth Amendment.

The state tort of malicious prosecution has three elements: (1) a criminal prosecution instituted against plaintiff by defendant, terminating in plaintiff's favor, (2) absence of probable cause for the criminal proceeding, and (3) malice or a primary purpose in bringing the action other than bringing the offender to justice. *Rivers v.*

*Ex-Cell-O Corp.*, 100 Mich. App. 824, 832 (1980). Defendants acknowledge that the first element has been satisfied, but they challenge that Plaintiff can satisfy the second element (or the third). As discussed above, Defendants argue that there was probable cause for Plaintiff's arrest, which also defeats Plaintiff's state law claims for false arrest (which requires an illegal or unjustified arrest) and false imprisonment (which requires an "unlawful restraint on a person's liberty of freedom of movement"). *Peterson Novelties, Inc. v. City of Berkley*, 259 Mich.App. 1, 17-18 (2003).

For purposes of the false or wrongful arrest, false imprisonment, and malicious prosecution claims, Defendants insist that Plaintiff is collaterally estopped from challenging probable cause for his arrest because he had an opportunity to challenge probable cause at his preliminary examination. Citing *Coogan v. City of Wixom*, 820 F.2d 170, 175 (6 th Cir. 1987) ("where the state affords an opportunity for an accused to contest probable cause at a preliminary examination hearing and the accused does so, a finding of probable cause by the examining magistrate or state judge should foreclose relitigation of that finding in a subsequent § 1983 action"). If, however, the state court's determination was based on materially false statements, a subsequent civil challenge to probable cause is not precluded. *Darrah*, 255 F.3d at 311; *Hinchman*, 312 F.3d at 202. As discussed throughout this memo, Plaintiff contends that there was no probable cause for his arrest, imprisonment, or prosecution. The

Court finds, however, that Plaintiff has not produced any evidence that any Defendants had malice or a primary purpose in bringing the action other than bringing the offender to justice (even Smith).

## E.   City Liability

A municipal defendant can only be subject to direct liability if it causes the constitutional harm because it "implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by" that body's officers. *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 (1978).   "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under Section 1983." *Id.* at 694.   A plaintiff cannot allege a viable claim based solely on vicarious liability or *respondeat superior. Id.* at 691.   The municipality's policy (or absence of one) must be a "moving force" in the deprivation of the plaintiff's constitutional rights and such policy must have arisen from "deliberate indifference" to the rights of its citizens. *Doe v. Claiborne Cty., Tenn.*, 103 F.3d 495, 508 (6th Cir. 1996).

In addition to policy or custom, the inadequacy of police training may serve as a basis for Section 1983 liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. *Canton*

23

*v. Harris*, 489 U.S. 378, 388 (1989).  A policy or custom may consist of: (a) the municipality's legislative enactments or official agency policies; (b) actions taken by officials with final decision-making authority; (c) a policy of inadequate training or supervision; or (d) a custom or tolerance or acquiescence of federal rights violations. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). The question is "whether the training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent 'city policy.'" *Harris*, 489 U.S. at 390.

Defendants first argue that Plaintiff has failed to plead a claim against the City of Detroit, asserting that Plaintiff never pleaded that the City of Detroit had a custom or policy that led to a deprivation of his rights.  Plaintiff pleaded (albeit not very specifically) that:

A.      "The unlawful conduct of Defendants on the DPD Home Invasion Unit were un[der]taken pursuant to known unlawful policy and practices of the Detroit Police Department in that the City of Detroit encourages, and is the motivating force[,] behind the misconduct at issue." Paragraph 84.

B.      "The City of Detroit fails to adequately train the officers on lawful conduct and it fails to supervise and manage them such that any means is justified if it results in convictions." Paragraph 86.

C.      "The practices of the DPD Home Invasion Unit dictates a policy of the ends justifies the means, including unlawful conduct provided it results in a conviction, regardless of the rights of a citizen." Paragraph 107.

D.      "The unlawful practices of the DPD Home Invasion Unit is the

24

proximate cause of Plaintiff's injuries, including confinement for eight months, emotional harm, los[t] wages, loss of employment and severe emotional distress." Paragraph 108.

Defendants next argue that Plaintiff's *Monell* claim must be dismissed because there was no violation of Plaintiff's constitutional rights, which means there could not be any unconstitutional policy that was a moving force of a constitutional violation. In his response brief, Plaintiff contends that the practice of taking pictures of detainees, before probable cause is established, is a violation of due process, predictably taints eyewitness identification in violation of the detainee's rights, and in this case was the moving force behind the misidentification that resulted in Plaintiff's unlawful arrest and injuries.

Plaintiff also asserts that Buscemi's method of presenting the photo array to Plaintiff was deficient because Buscemi created the photo array and presented it to KR. Plaintiff contends that, for large police agencies like the DPD, it is recommended that a separate, independent person present the photo array to a witness (the double-blind method). Citing *Model Policy, MPTC*, June 2017, Executive Law 837 (21) (https://www.criminaljustice.ny.gov/pio/press_releases/ID-Procedures-Protocol-Model-Policy-Forms.pdf at 1); NJ Att'y Gen. Guidelines for Preparing and Conducting Photo and Live Lineup Identification Procedures (https://www.state.nj.us/lps/dcj/agguide/photoid.pdf); Baltimore Police Dep't Policy

1009, August 2016 (https://www.baltimorepolice.org/1009-double-blindsequential-photographic-array-procedures); Michigan Commission on Law Enforcement Standards, Eyewitness Identifications, April 2014 (https://www.michigan.gov/documents/mcoles/MCOLES_April_2014?453954_7.pdf). Plaintiff states that the sequential, double-blind process is endorsed by the State Bar of Michigan, the National Innocence Project, and the Michigan Commission on Law Enforcement Standards (MCOLES). Citing Michigan Commission on Law Enforcement Standards, Eyewitness Identifications, April 2014.

Plaintiff also notes that the Prosecuting Attorneys Association of Michigan has issued a Best Practices Recommendation and Eyewitness Identification and Procedures and encourage police agencies to provide officers with training on photo array and live lineup administration. Citing Prosecuting Attorneys Assoc. of Mich., April 2015 (https://pceinc.org/wp-content/uploads/2017/10/20160415-BestPracticesRecommendationEyewitnessIdentificationandProcedures-ProsecutingAttorneysAssociationofMichigan.pdf). That association recommends that, "[t]o the extent practicable, considering the size of the agency as well as personnel and staffing issues, all law enforcement agencies should adopt double-blind or blinded administration of both photo arrays and live lineups as a preferred practice." *Id.* Plaintiff argues that there is no rationale for DPD not to train, supervise, and adopt

26

eyewitness identification procedures that follow the best practices recognized throughout Michigan and the United States.

Plaintiff asserts that the City of Detroit is liable because the officers violated DPD policy against a single photo show-up, and irreparably tainted the subsequent photo array, when: (1) only the photo of Plaintiff was shown to KR shortly after the break-in at her house; and (2) the assigned report number on the photo array matched the officers' narrative report number from the initial encounter. Plaintiff states that DPD directive number 203.11-2 requires officers to adhere to certain eyewitness identification procedures to maximize the reliability of identifications, minimize unjust accusations, and conform to established legal procedures, including never showing a witness only a photograph of the suspect. ECF No. 56, Ex. 12.

Plaintiff argues that Sage or Smith asked Pierce to send over a photograph and that request was complied with immediately, without question or surprise by any officer on the scene. Plaintiff asserts that, after the photo was shown to KR, it was no surprise when she later picked Plaintiff in the photo array presented by Buscemi. Plaintiff also challenges why a photo of him was necessary or taken pursuant to an investigatory stop, as Pierce (and perhaps others) had already determined that Plaintiff did not have many of the characteristics indicated by KR - namely the lack of an earring, no baseball cap, normal (not yellowish) teeth, and light colored pants rather

than dark pants.

Plaintiff argues that the description of the perpetrator by KR prior to being shown the photo of Plaintiff did not match, including indicating that the perpetrator had an earring in his left ear and no mention of facial hair. Plaintiff argues that the practice of taking pictures of detainees is a common practice by DPD and constitutes an unconstitutional custom or practice, particularly since DPD did not train its officers regarding eyewitness identification and use of photo arrays.

Buscemi testified that he only learned of the double-blind procedure for presenting a photo array in preparation for his deposition and also was unfamiliar with a blind procedure ECF No. 56, Ex. 6 at 13. He testified that he had not received any training on administering a photo array and had only experience with a few photo arrays as of November 2017. *Id.* at 12. He also testified that he was not familiar the best practices described above, including using a separate administrator for presentation of the photo array, recording the photo array by audio or video, or presenting the photos in separate folders in sequential order. *Id.* at 19-21. Plaintiff suggests that there has been a complete failure to train by the DPD, which constitutes such recklessness or gross negligence that police misconduct is almost inevitable – and unconstitutional. Citing *Harvey v. Campbell Cnty., Tenn.*, 453 F. App'x 557, 567 (6th Cir. 2011) (quotation omitted).

28

As noted above, Pierce's narrative report, including his conclusion that Plaintiff was not the suspect, was tracked with another case number and was never provided to Plaintiff's counsel in the criminal proceeding against Plaintiff. This was a violation of the *Brady* rule. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Suppression of evidence favorable to an accused upon request violates due process where evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of prosecution.

Plaintiff sets forth an argument regarding two other cases, *Briggs v. City of Detroit*, Wayne County Circuit Court No. 19-013847-NO, and *Johnson v. Vanderkooi*, 502 Mich. 751 (2018), to support his argument that the DPD engaged in a pattern of unconstitutional conduct. Both cases, however, appear to involve circumstances or a decision rendered after the alleged conduct by Defendants, including the City of Detroit.

Defendants contend that the operation of a police force for the benefit of the general public is an exercise of a duly authorized governmental function. M.C.L. § 91.1. Defendants state that, accordingly, the City of Detroit has governmental immunity from Plaintiff's tort claims under state law. *See* M.C.L. § 691.1407 ("Except as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental

29

function."). Defendants argue that Plaintiff has not met its burden of demonstrating that governmental immunity does not apply, *Odom v. Wayne Cnty.*, 482 Mich. 459, 478-79 (2008), and in any event, no exceptions to governmental immunity apply in this case. Citing M.C.L. § 691.1401 *et seq*. Plaintiff did not respond to this argument.

Defendants also assert that they are entitled to summary judgment with respect to any alleged deprivations of Plaintiff's rights under the Michigan Constitution because there is no basis for liability for any such violations.   Plaintiff did not respond to this argument.

**F.    Supplemental Response Brief**

Plaintiff has also filed a Motion to File an Additional Response Brief. ECF No. 57.  The proposed response brief relates to a matter not set forth in his Complaint or at issue in the case (DPD's policy on facial recognition software policy), at least before this proposed response.  The Court denies the Motion to File an Additional Response Brief.

**IV.    CONCLUSION**

For the reasons stated above,

IT IS ORDERED that Defendants' Motion for Summary Judgment [ECF No. 48] is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED that Count Four is DISMISSED and Counts I, II, and III remain, in whole or in part, before the Court.

IT IS FURTHER ORDERED that Plaintiff's state law malicious prosecution claim in Count II is dismissed as to all Defendants and Plaintiff's federal malicious prosecution claim is dismissed with respect to Defendant Pierce.

IT IS FURTHER ORDERED that Plaintiff's Motion to File an Additional Response Brief [ECF No. 57] is DENIED.

IT IS ORDERED.

s/Denise Page Hood
DENISE PAGE HOOD
Dated: September 30, 2022          UNITED STATES DISTRICT JUDGE